IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DONNA M. SZCZUREK,         :                 CIVIL ACTION
      Plaintiff,                :
                           :
      v.                     :
                           :
JO ANNE B. BARNHART,        :
Commissioner of the            :
Social Security Administration,  :
      Defendant.            :         NO. 04-4858

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE               December 13, 2005

      This action was brought pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final

decision of the Commissioner of the Social Security Administration (the "Commissioner"), which

denied the application of Donna M. Szczurek (alternatively "Szczurek" or "Plaintiff") for disability

insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 301, *et seq.* (the

"Act"). Presently before the Court are the parties' cross-motions for summary judgment (Doc. Nos.

5 & 8), briefs in support thereof (hereinafter "Pl. Br." and "Def. Br." respectively), Plaintiff's reply

to the Commissioner's motion and brief ("Pl. Reply Br."), and the record of the proceedings before

the Administrative Law Judge ("ALJ"). Plaintiff asks the Court to reverse the decision of the

Commissioner and remand this matter solely for the calculation and payment of benefits to Plaintiff.

(Pl. Br. at 36 & Proposed Order.) The defendant Commissioner opposes this motion and seeks the

entry of an order affirming the decision of the ALJ. (Doc. No. 8.)

      For the reasons set out below, we **RECOMMEND** that Plaintiff's Motion be **GRANTED**

**IN PART AND DENIED IN PART**, that Defendant's Motion be **DENIED**, and that the matter be

1

**REMANDED** for a re-evaluation by the ALJ in light of the errors we identify herein.

## I.     PROCEDURAL HISTORY

Szczurek protectively filed her application for benefits on March 26, 2003, alleging an onset of disability of April 29, 2002.  (Tr. at 72, 75.)  A hearing was held before an ALJ on January 26, 2004, at which time testimony was taken from Szczurek and a vocational expert.  At the request of Szczurek's attorney, the ALJ left the record open for the submission of additional medical evidence. Following the receipt of the additional records, the ALJ issued a decision finding that, although Szczurek had a severe impairment, she was not disabled and therefore not entitled to benefits.  The Appeals Council denied Szczurek's request for review, making the ALJ's decision the final decision of the Commissioner.   Szczurek timely filed this civil action seeking judicial review of the Commissioner's decision.  (Doc. No. 1.)

## II.    ISSUES ON APPEAL

Plaintiff asserts that the ALJ failed to meet her burden to show that Szczurek, although incapable of performing her past work, could perform other substantial gainful activity.  Plaintiff challenges the evidence on which the ALJ reached her conclusions as to Szczurek's residual functional capacity, particularly with respect to the weight given to the opinions of various medical sources.  Plaintiff particularly points to medical opinions concerning her ability (or inability) to sustain substantial gainful activity on a full-time basis.  She argues that the opinion of one of the doctors credited by the ALJ restricting Szczurek to only part-time work requires a finding of disability.  (Pl. Br. at 26-35.)

The Commissioner argues that the ALJ's decision was supported by substantial evidence and should not be disturbed on appeal.  (Def. Br. at 2.)

## III.   FACTUAL BACKGROUND

### A.   Vocational Background

Szczurek was 37 years old at the time of the hearing.  (Tr. at 32.)  She had a high school education, with one year of additional schooling.  (Tr. at 113.)  Her past relevant work experience was as a mail carrier, which involved, in an eight-hour day, sorting mail into trays for approximately three hours and then putting it into her truck and delivering it.  (Tr. at 34.)  After suffering an injury at work on April 29, 2002, she received worker's compensation benefits until March 2003.  (Tr. at 35.)  She returned to work temporarily on limited duty and with limited hours in May 2002.  She stopped working after just two weeks, however, due to what she described as unbearable pain after sitting for 30 to 60 minutes.  (Tr. at 33, 107.)  She had another unsuccessful part-time work attempt with the postal service for about one week in October 2002.  In that position, Szczurek sat for the bulk of her four-hour shift.  (Tr. at 33, 38, 107.)  She complained that her neck stiffened up after 45 to 50 minutes and that her arm and right hand went numb.  (Tr. at 41-42.)[1]

### B.   Medical Evidence

Szczurek alleged disability due to disc herniation of the thoracic spine and pinched nerve in the cervical and thoracic spine, affecting her neck and right arm.  (Tr. at 107.)  She first experienced pain associated with these conditions at work on April 29, 2002 while lifting a 20-lb. mailbag over her right shoulder and turning her head.  That evening, she went to see her family physician, Ira C.

---

[1]      Szczurek is right-handed.  (Tr. at 33.)

Gerstman, M.D.  (Tr. at 204.)  He noted that she appeared to be in moderate distress and moved very stiffly, with a decreased range of motion in her neck and significant muscle tenderness.  (Tr. at 204.)  He diagnosed a strain of the right trapezius muscle as well as cervical strain.  (Tr. at 204.)  He prescribed Naproxen[2] and Tylenol and rest with ice massage.  (Tr. at 204.)  Szczurek reported to Dr. Gerstman that her neck and back were slightly worse on May 1, 2002 and that she had radiation of pain down her back.  (Tr. at 203.)  She reported that, after April 29, she discontinued the pain medication Dr. Gerstman prescribed due to side effects she experienced that first day.  (Tr. at 203.)  Dr. Gerstman observed at the May 1 visit that she had difficulty moving her neck and that she had persistent tenderness and significant spasm in the neck and shoulder area.  (Tr. at 203.)  After reviewing radiology films,[3] he diagnosed her with cervical strain, thoracic strain, and right trapezius strain.  (Tr. at 203.)  He prescribed physical therapy and recommended Tylenol to help with sleep and Advil to help with pain.  (Tr. at 203.)  Dr. Gerstman observed on May 13, 2002 that Szczurek was doing "significantly better" since starting physical therapy and that the pain in her right posterior neck, shoulder, and thorax were lessened.  (Tr. at 202.)  He recommended that she continue physical therapy and released her to perform "modified work" for a period of two weeks, working four hours per day with no lifting.  (Tr. at 202.)  He completed a form on that date indicating that Szczurek could: sit eight hours per day; walk or stand intermittently four hours per day; lift no more than 10 lbs.; do no pushing or pulling; and, until May 27, work no more than four hours per day.  (Tr. at

---

[2]     Naproxen is a non-steroidal anti-inflammatory medication prescribed for the relief of osteoarthritis and rheumatoid arthritis.  *Physicians' Desk Reference* 2269-70 (60th ed. 2006).

[3]     A radiological study of the cervical and thoracic spine on May 1, 2002 (two days after Szczurek first experienced neck pain at work) revealed no traumatic injury and mild degenerative changes at C5-C6.  (Tr. at 162.)

288.)  At her next visit on May 29, 2002, Szczurek complained to Dr. Gerstman that she began to stiffen up approximately three hours into working her modified shift, and she presented as "significantly stiffer" than at her previous visit.  (Tr. at 201.)  He opined that while her thoracic strain had resolved, her improvement on her cervical strain and right trapezius strain had plateaued and she had experienced a new left trapezius strain.  (Tr. at 201.)  He recommended that she continue physical therapy, continue in the modified position, and be more careful regarding the ergonomics of her workplace.  (Tr. at 201.)  After she reported increased arm weakness and neck pain on June 6, 2002, Dr. Gerstman referred her to Dr. Richard A. Goldberg, an orthopedic specialist in industrial and rehabilitation medicine.  (Tr. at 201.)  Even as she treated with specialists, Szczurek occasionally presented her problems to Dr. Gerstman.  On August 23, 2003, she saw him regarding acute neck spasms and pain she reportedly experienced on an intermittent but recurring basis.  (Tr. at 224.)  He prescribed Vicodin[4] and Flexeril[5] and recommended that she obtain an additional consultation.  (Tr. at 224.)

Szczurek treated with Dr. Goldberg for several months.  At her initial visit of June 20, 2002, her cervical range of motion was "about 20% of normal" in all respects.  (Tr. at 159.)  On June 28, 2002, Szczurek reported that she felt better since beginning the medication regimen prescribed by Dr. Goldberg, and her range of motion was improved following manipulation.  (Tr. at 158.)  Dr. Goldberg did not believe at that time that she could return to work as a letter carrier.  (Tr. at 158.)

---

[4]     Vicodin is a narcotic analgesic prescribed for the relief of moderate to moderately severe pain.  *Physicians' Desk Reference* 530 (60th ed. 2006).

[5]     Flexeril is prescribed for short-term use to relieve skeletal spasm associated with acute, painful musculoskeletal conditions.  It is not indicated for spasms due to central nervous system disease.  *Physicians' Desk Reference* 1832-33 (60th ed. 2006).

His observations and conclusion were largely the same when he saw her the following week and later in July 2002. (Tr. at 157-58.) As a result of his examination of August 16, 2002, Dr. Goldberg noted that Szczurek was manifesting more signs and symptoms of fibromyalgia, in that she had multiple trigger points of pain. He did not observe improvement since her last visit in terms of her cervical range of motion, although he noted normal range of motion of the shoulder. (Tr. at 157.) Dr. Goldberg noted improved range of motion on September 11, 2002, after Szczurek began treating with a chiropractor. (Tr. at 156.) He noted no signs or symptoms of radiculopathy. (Tr. at 156.) He cleared her to return to work at a sedentary level, with no repetitive motions of the upper extremities, and limited to four hours per day. (Tr. at 156.) He hoped that, with continued chiropractic manipulation and physical therapy, Szczurek would be able to work at the light duty level with increased "hourly activities." (Tr. at 156.) At her return visit on October 14, 2002, Dr. Goldberg noted that Szczurek still had "significant limitations on motion of the cervical spine, especially on left rotation and side bending," and that there was diffuse trigger point activity in the shoulder area, especially on the right side. (Tr. at 155.) He also noted diffuse lower back pain. (Tr. at 155.) Dr. Goldberg continued in his belief that she could work in a sedentary duty position four hours daily. (Tr. at 155.) He did not observe much improvement following his manipulation of Szczurek at her next visit on November 1, 2002. (Tr. at 155.) Dr. Goldberg saw her for a final time on February 11, 2003. He noted that she continued to complain of significant pain in the neck, mid-back, and right arm. (Tr. at 153.) He observed a "relatively normal" range of motion of the cervical spine. (Tr. at 153.) Although Szczurek complained of tightness and discomfort in the neck area, he did not observe any radiculopathy. (Tr. at 153.) He was unable to explain her symptoms on the basis of the objective medical evidence in her file and her physical examination. (Tr. at 153.) He

recommended that she get a second opinion from a neurosurgeon.  (Tr. at 153, 155.)

Szczurek began treating with Evelyn D. Witkin, M.D., an orthopedic surgeon, on November 6, 2002.  At that time, she described "constant" and "crampy" pain in her back and sides of neck that radiated to her right arm.  (Tr. at 192, 193.)  Szczurek reported that the pain was affecting her sleep, was aggravated by sitting or standing for a long time, and was alleviated only by lying down and application of heat.  (Tr. at 192, 193.)  On physical examination, Dr. Witkin observed "severe spasm" in the right shoulder and "extreme tenderness" of the thoracic spine.  (Tr. at 189.)  She diagnosed cervical radiculopathy and dorsal sprain and certified her as "totally incapacitated" until further notice.  (Tr. at 191.)  Dr. Witkin observed great difficulty in range of motion of the shoulder and neck at a follow-up visit on December 26, 2002 and noted that Szczurek "seem[ed] to be getting worse."  (Tr. at 186.)  Dr. Witkin discontinued all physical therapy and gave her prescriptions for Bextra[6] and Neurontin.[7]  (Tr. at 186.)  She opined that Szczurek was not capable of returning to work at that time.  (Tr. at 186.)  In paperwork submitted relative to Szczurek's worker's compensation claim, Dr. Witkin certified an "indefinite" period of "total disability."  (Tr. at 185.)  At her visit on January 13, 2003, Szczurek complained of continued pain, despite taking Neurontin and Advil.  (Tr. at 182.)  Dr. Witkin recommended an epidural steroid or selective nerve root block.  (Tr. at 182.)  Dr. Witkin saw her again on January 23, 2003 and noted that she was "in extreme pain."  (Tr. at 180.)  She expressed her disagreement with Dr. Goldberg's tentative diagnosis of fibromyalgia due

---

[6]     Bextra is a non-steroidal anti-inflammatory drug that is indicated for osteoarthritis and rheumatoid arthritis.  *Physicians' Desk Reference* 2695-96 (59th ed. 2005).

[7]     Neurontin is an analgesic used to manage post-herpetic neuralgia.  *Physicians' Desk Reference* 2498-2500 (60th ed. 2006).

to the MRI evidence of disc herniation at multiple levels[8] and opined that Szczurek would not be able to return to work for at least the three months following the first in a series of epidural injections.  (Tr. at 178.)  Dr. Witkin observed on April 24, 2003 that, after having received one epidural injection, Szczurek continued to have pain in the right shoulder.  (Tr. at 174-75.)  At a follow-up visit on August 28, 2003, Szczurek reported continued severe pain in her right upper extremity that disturbed her sleep and prevented her from being able "to stand for any length of time or sit, lift or walk." (Tr. at 253.)  She reported that the pain was relieved by some medications.  (Tr. at 253.)  Dr. Witkin observed that Szczurek's employer was "not accommodating her with her physical requirements" and declared her "unfit for duty."  (Tr. at 253-54.)

Michael S. Yoon, M.D., the neurosurgeon recommended by Dr. Goldberg, first saw Szczurek on February 14, 2003.  He noted a decreased range of motion of flexion and extension.  (Tr. at 165.) He reviewed the December 3, 2002 MRI study[9] and an EMG and nerve conduction evaluation of January 3, 2003.[10]  He diagnosed right C5 radiculopathy.  (Tr. at 165.)  He recommended cervical epidural steroid injections and prescribed Valium for muscle spasm.  (Tr. at 166.) He recommended that Szczurek "remain out of work" until he could see her again the following month.  (Tr. at 166.)

---

[8]     MRI studies conducted on December 3, 2002 showed: 1) right-sided disc herniation at T8-T9 that touched and slightly deformed the spinal cord; and 2) disc herniations at C4-C5 (small), C5-C6 (small), and C6-C7 (small to moderate) without stenosis and which did not touch the cord.  (Tr. at 145-46.)

[9]     See note 8, *supra*.

[10]     An EMG and nerve conduction study conducted on January 3, 2003 suggested C4-C5 nerve root irritation and radiculopathy on the right side.  (Tr. at 148.)  On physical examination at that time, palpation of the cervical spine revealed tenderness in the paraspinal muscles.  Spasms in these muscles were also observed.  Szczurek's cervical spine range of motion was 30 degrees on flexion and 40 degrees on extension.  Both the right and left rotation and lateral flexion were 20 degrees.  (Tr. at 147.)

Dr. Yoon reiterated these findings and recommendations on February 18, 2003 when he submitted paperwork relative to Szczurek's worker's compensation claim and certified a "period of total disability" from February 14, 2003 (the date he first examined her) until April 14, 2003. (Tr. at 167.) At a follow-up visit on March 14, 2003, Dr. Yoon noted that Szczurek experienced a "slight improvement in her symptoms" following her one epidural steroid injection but that "overall she [had] not had significant relief." (Tr. at 164.) At Dr. Yoon's recommendation, on April 2, 2003 Szczurek underwent a CT myelogram, which revealed "mild blunting of the right C7-T1 nerve root sleeve" and small disc bulges but no deformity of the cord — a finding that was "not entirely consistent with her symptoms nor her previous MRI." (Tr. at 163, 169-70.) Dr. Yoon opined that her pain was "primarily musculoskeletal in nature and not neurological." (Tr. at 163.)

In conjunction with Szczurek's worker's compensation claim, Steven J. Valentino, D.O., an orthopedic surgeon, performed an IME on November 18, 2002. Dr. Valentino found that gentle persistence enabled her to exhibit a full range of motion in the cervical, thoracic, and lumbar regions without spasm. (Tr. at 303.) His impression was that her shoulder, cervical, and thoracic strain was resolved. (Tr. at 304.) Based on his review of her records and what he characterized as normal objective findings of physical examination, Dr. Valentino opined that Szczurek did not suffer any residuals from her April 2002 injury and was able to return to her pre-injury position without any restrictions and on a full-time basis. (Tr. at 304.)

A copy of Dr. Valentino's report was provided to Dr. Goldberg for his assessment. (Tr. at 287.) Dr. Goldberg referred to this report in a letter to Dr. Gerstman dated February 11, 2003, which read in part:

> Donna was seen by Steve Valentino. The Department of

9

Employment Standards Administration asked me to review his
dictation date and his recommendations, which I agreed with on
January 6, 2003. . . . Please note that I did send Donna back to work
on October 28, 4 hours a day.  She was unable to continue working
due to an increase in discomfort.  However, I cannot explain her
symptomatology on the basis of the objective findings that we have
presently and her clinical examination.  Please note again that on
January 6, 2003, although I believe Dr. Valentino's opinion, this is
solely based on my last examination of Donna on November 1, 2002.
. . . I have asked that she get a totally unbiased opinion by Dr. Yu
[sic], a neurosurgeon, at Abington Memorial Hospital to see if we
[sic] can help us out with the situation.

(Tr. at 152-53.)[11]

On June 12, 2003, a state agency reviewing physician, V.H. Popat, M.D., evaluated

Szczurek's claim with the benefit of forms completed by her and the medical records of Drs.

Gerstman, Goldberg, Witkin, and Yoon compiled as of that date.  Dr. Popat found that Szczurek

could only lift less than 10 lbs., even on an occasional basis; stand or walk at least 2 hours in an 8-

hour workday; and sit about 6 hours in an 8-hour workday.  (Tr. at 217.)  He found that she could

occasionally engage in postural activities such as climbing, stooping, and kneeling.  (Tr. at 218.)

After reciting her symptoms in his report and noting that certain complaints were not supported by

the medical evidence in the file, he opined that Szczurek was "partially credible."  (Tr. at 221.)  He

noted that she had been released to work in a sedentary capacity.  (Tr. at 222.)

Finally, Szczurek was evaluated by a physiatrist, V. Theerasakdi, M.D., on September 4,

2003.  She reported the history of her symptoms, including the recurrent intensification of spasms

in her neck, and her experience of intensified symptoms with activity.  (Tr. at 232.)  At the time of

her examination, she was taking Motrin daily, Advil two to three times per week, and Flexeril on an

---

[11]     The report indicates that it was dictated but not read by Dr. Goldberg.  (Tr. at 153.)
It contains no handwritten edits, although it appears to be signed.  (Tr. at 152-53.)

intermittent basis.  (Tr. at 232.)  Dr. Theerasakdi observed tenderness and a severe restriction of movement of the cervical spine, as well as Szczurek's report of significant increase in pain on motion.  (Tr. at 233.)  He classified Szczurek as having "chronic pain" based on her reported symptoms and diagnosed her with what he termed right upper quadrant regional pain syndrome.  (Tr. at 234.)  He advised that "[v]ocational activities [were] not in the formula of treatment at [that] time."  (Tr. at 234.)  He and Szczurek decided on a course of pain management (consisting of Oxycontin,[12] Percocet,[13] and Zanaflex[14]) before embarking on physical rehabilitation, although she was not able to tolerate these medications well or correctly adhere to the regimen.  (Tr. at 234, 229, 227.)  Nonetheless, as she reported to Dr. Theerasakdi on September 29, 2003, she was able to perform her daily activities with more ease since taking the medications and could use her right arm more.[15]  (Tr. at 227.)  She appeared at that time to be experiencing less pain and to be more comfortable, although she also appeared sleep deprived.  (Tr. at 227.)  Dr. Theerasakdi altered her pain medication in the hope that pain management would allow her to pursue some form of physical therapy.  (Tr. at 228.)

---

[12]     Oxycontin is an opioid analgesic prescribed for the management of moderate to severe pain when a round-the-clock pain control is needed for an extended period of time. *Physicians' Desk Reference* 2699-2701 (60th ed. 2006).

[13]     Percocet is comprised of the active ingredients in Oxycontin and Tylenol. *Physicians' Desk Reference* 1114 (60th ed. 2006).

[14]     Zanaflex is a muscle relaxant. *See* http://www.drugs.com/zanaflex.html (visited Dec. 2, 2005).

[15]     Dr. Theerasakdi noted that Szczurek apparently did not volunteer the fact that she could use her right arm more and suggested that this information was provided only in response to a specific question from him.  In addition, he noted that, "[w]ith more specific inquiry, she did admit" that the most recent recurrence of her periodic neck spasm was less severe than in the past after taking Oxycontin.  (Tr. at 227.)

### C.    Claimant's Allegations Regarding Impairments and Activities

As part of the initial state agency review of her claim, Szczurek submitted various responses describing her daily activities and limitations.  She alleged that she could not do any outside activities, such as sports, with her husband or children.  (Tr. at 125.)  She alleged that if she tried to do too much, she would experience "a lot of pain" turning her neck and that her arm and shoulder would be very sore.  (Tr. at 125.)  She stated that she would get stiff if she was in a car for more than 1-1/2 hours and that she could only attend to yard work and housekeeping activities "in spurts."  (Tr. at 126-27.)  She was able to walk around the block and manage the steps in her home. (Tr. at 127.) She complained that sitting for more than 45 to 60 minutes caused the upper part of her right arm to stiffen.  (Tr. at 127.)  She explained that her pain traveled from her neck to her right shoulder and arm.  (Tr. at 128-29.)  As of May 2003, she reported that she took 2 to 4 tablets of Advil each day for pain.  (Tr. at 130.)  By July 2003, however, she reported that she was taking 1 to 3 doses of Advil each day and Valium once a week.  (Tr. at 139-40.)

At the hearing, Szczurek testified that her ability to complete household chores changed from day to day and that she often had to sit down after performing a number of tasks.  (Tr. at 36.)  She testified that her children, ages 7 and 10, were home with her during their summer vacation and that she, her husband, and her children spent five days at Disney World the previous summer, although she claimed that her activities were limited.  (Tr. at 33, 37, 45.)

Szczurek testified that she experienced pain in her neck and down her right arm, causing her right elbow and hands to become numb and tingle.  (Tr. at 45.)  She testified that sitting for 25 to 30 minutes caused her to stiffen up.  (Tr. at 46.)  She claimed that she could not walk more than a block. (Tr. at 46.)  She testified that her pain medications affected her concentration.  (Tr. at 46.)  She

explained that on "good days" she could get some chores done but that on "bad days" she had to take breaks between tasks. (Tr. at 46.) She testified that she cooked, shopped, and attended her children's sporting events when she felt well enough, but that otherwise her family assisted with these tasks. (Tr. at 47-48.) She stated that she had difficulty sleeping on her right side because of her shoulder. (Tr. at 47.)

###    D.    Vocational Expert Testimony

An impartial vocational expert ("VE") explained that Szczurek's past work as a mail carrier was considered to be at the medium exertional level and was a semi-skilled position. (Tr. at 49.) He testified that the work she performed temporarily in October 2002, when she sorted mail at a desk and periodically had to carry a tub of mail within the office, was light duty work. (Tr. at 51.)

The VE was presented with a hypothetical involving an individual of Szczurek's age, education, and past work history who was limited to lifting and carrying 10 lbs. with a non-dominant upper extremity (using the dominant extremity as an assist only) and who could stand and walk six hours and sit as long as eight hours performing simple routine tasks. The VE testified that such an individual would not be able to perform work as a mail carrier but that he or she could work as a cashier at a self-service gas station or parking lot, a ticket-taker, a table worker, a surveillance system monitor, or an automatic grinder machine operator — positions that were within a limited range of light and sedentary unskilled work. (Tr. at 49-51.) He testified that these positions could be performed sitting or standing, at the option of the employee. (Tr. at 52-53, 56.) The VE also was posed a hypothetical involving a claimant who could only stand or walk one hour at a time and only sit 45 minutes at a time. The VE testified that such a claimant would be able to perform the jobs he identified. (Tr. at 54-57.) The VE further testified that, with respect to any position, "substantial

gainful activity" would require attendance eight hours per day, five days per week and that an absenteeism rate of greater than one day per month, on average, would not be acceptable. (Tr. at 57-59.)

### E.    The ALJ's Decision

The ALJ's decision followed the five-step sequential evaluation set forth in 20 C.F.R. § 404.1520. At Step One, the ALJ found that, notwithstanding her light duty assignments in May and October 2002, Szczurek had not engaged in substantial gainful activity since April 29, 2002, the alleged date of disability onset. (Tr. at 17.) At Step Two, the ALJ found that Szczurek's degenerative disc disease of the thoracic and lumbar spines qualified as severe impairments. (Tr. at 17.) At Step Three, the ALJ determined that none of the impairments met or equaled the listing for Disorders of the Spine as set forth in Section 1.04 of Appendix 1 to Subpart P of Regulations No. 4. (Tr. at 17-19.)

Before proceeding to Step Four, the ALJ evaluated Szczurek's residual functional capacity ("RFC"), giving consideration both to the medical evidence of record and her subjective complaints. The ALJ noted Dr. Goldberg's September 11, 2002 opinion that Szczurek could return to work, limited to sedentary duties, for four hours per day. (Tr. at 20.) She also noted that Dr. Goldberg found insufficient objective medical evidence to explain Szczurek's self-described symptoms and that he expressed his agreement with the opinion of Dr. Valentino (the IME doctor) — who had concluded that any injury Szczurek suffered was resolved by November 2002. (Tr. at 20.) Because she found his opinion to be well-supported and not inconsistent with the entire record, the ALJ accorded Dr. Goldberg's opinions "probative weight." (Tr. at 20.) By contrast, the ALJ accorded "no significant weight" to the opinion of Dr. Witkin that Szczurek was not capable of returning to

work at any time since she began treating her in November 2002.  (Tr. at 20.)  The ALJ found that Dr. Witkin's opinion was not well-supported by objective medical evidence and was more restrictive than Szczurek's activities themselves demonstrated. (Tr. at 20.) The ALJ accorded "limited weight" to the opinion of the state agency non-treating, non-examining reviewing physician that Szczurek could perform sedentary work with postural limitations.  (Tr. at 20.)  However, she accorded "significant weight" to the opinion of Dr. Valentino, whose IME report found that Szczurek's injury no longer limited her as of November 18, 2002, "to the extent it is well supported by the objective and other evidence of record" and because of Dr. Goldberg's endorsement of it.  (Tr. at 20.)  The ALJ's decision did not assign weight to any opinions or assessments of Dr. Gerstman (the family physician), Dr. Yoon (the neurosurgeon), or Dr. Theerasakdi (the physiatrist).

As part of her RFC assessment, the ALJ also considered the other evidence of record, including the claimant's subjective complaints and her credibility as to these symptoms.  (Tr. at 20.) The ALJ noted that Szczurek, while taking only Advil for pain, reported in May 2003 that she had no problems with personal care; could drive up to one and a half hours; could cook meals; could do minimal vacuuming and shopping; and could do yard work in spurts.  (Tr. at 20.)  By contrast, the ALJ noted, at the hearing held in January 2004, Szczurek testified that her husband and 10-year old son helped her with daily tasks (Tr. at 21); that she had help taking care of her children (Tr. at 21); that she could only walk one block and could only sit for 15 to 30 minutes (Tr. at 20); and that she needed breaks throughout the day.  (Tr. at 20-21.)  However, she also admitted that she traveled with her family to Disney World in 2003 for five days.  (Tr. at 21.)

The ALJ concluded that Szczurek's subjective complaints of pain and reported restrictions "greatly exceed[ed] what the objective medical and clinical findings could reasonably be expected

to produce" and that they were inconsistent with Szczurek's actual, demonstrated activities.  (Tr. at 21.)  As a result, the ALJ did not fully credit Szczurek's testimony.  (Tr. at 21.)  She concluded that Szczurek was capable of lifting up to 10 lbs. with her left hand and using her right hand as an assist; standing or walking up to six hours in an eight-hour work day; and sitting eight hours.  (Tr. at 21.) The ALJ found Szczurek additionally limited, however, to work involving simple and routine tasks. (Tr. at 21.)

Based on this RFC assessment, the ALJ found that Szczurek could not perform her past relevant work, which was as a mail carrier and which was characterized by the VE as at the medium level of exertion.  (Tr. at 21.)  As a result, and as the ALJ recognized, the burden of proof shifted to the Commissioner to identify jobs existing in the national economy that Szczurek was capable of performing.  (Tr. at 21.)  The ALJ found that the Commissioner met her burden based on the VE's testimony that an individual with an RFC consistent with that ultimately found by the ALJ to describe Szczurek could perform several light or sedentary unskilled jobs, including cashier, ticket taker, table work, surveillance, and machine operator.  (Tr. at 21-22.)  As a result, the ALJ found that Szczurek was not "disabled" within the meaning of the Act.  (Tr. at 22.)


## IV.   <u>STANDARD OF REVIEW</u>

This Court must determine whether substantial evidence supports the Commissioner's final decision.  42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).  The factual findings of the Commissioner must be accepted as conclusive, provided that they are supported by substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971) (citing 42 U.S.C. § 405(g)); *Rutherford*, 399 F.3d at 552.  Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401; *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Rutherford*, 399 F.3d at 552.

## V.   DISCUSSION

In this appeal, Plaintiff asserts that Defendant has not met her burden of proof at Step Five of the sequential evaluation, wherein she is required to establish that there is other employment, if not the claimant's past relevant work, that the claimant is capable of performing. (Pl. Br. at 25-26.) As part of this position, Plaintiff contends that the ALJ's findings at the Step Five stage were not supported by substantial evidence because the ALJ relied upon testimony of the VE in response to a flawed hypothetical derived from a misreading of the record (Pl. Br. at 27, 33) and because her assessment as to which doctor's opinions merited weight was inconsistent with her other findings. (Pl. Br. at 28-31, 35.) Plaintiff alleges that Dr. Goldberg's opinion — which the ALJ characterized as well-supported and which, according to Plaintiff, only envisioned Szczurek working on a part-time basis — requires a finding of disability. While we do not accept Plaintiff's invitation to re-weigh the evidence to find her disabled, we agree that flaws in the ALJ's analysis warrant a remand.

Of particular importance to our assessment is the fact that the ALJ implicitly rejected the opinion of Dr. Valentino at Step Four yet afforded this same opinion "significant weight" when she formulated Plaintiff's RFC, which was used to find Plaintiff not disabled at Step Five. This inconsistent use of Dr. Valentino's findings undermines our confidence that the ALJ's findings are supported by substantial evidence.

Dr. Valentino opined, based on his single examination of Szczurek on November 18, 2002

and his review of her medical records as of that date, that she had suffered only from shoulder, cervical, and thoracic strain and that these conditions were "resolved." (Tr. at 304.) He concluded that she could return to her prior position as a mail carrier "without restriction on a full time basis" and that she required no further supervised medical care. (Tr. at 304.) In her March 13, 2004 decision, however, the ALJ found that Plaintiff "has had severe degenerative disc disease of the thoracic and cervical spines" since April 29, 2002, the alleged disability onset date (Tr. at 22), and that she was "precluded from her past relevant work." (Tr. at 23.) Thus, the ALJ implicitly *rejected* the crux of Dr. Valentino's opinion. Despite this, the ALJ appears then to have *relied* on Dr. Valentino's opinion, as well as her own understanding of Plaintiff's activity level and limitations, when she concluded that Plaintiff retained the capacity to lift up to 10 lbs. (albeit with her left hand, using her right hand only as an assist), to stand for up to six hours in an eight-hour work day, and to sit for as many as a full eight hours. We cannot reconcile her decision to afford this opinion "significant weight" (Tr. at 20) when assessing Plaintiff's residual functional capacity, particularly at the expense of treating physician opinions, in light of her earlier rejection of it.[16] The ALJ cannot have it both ways.

     Moreover, we are not persuaded that Dr. Goldberg's "agreement" with Dr. Valentino's opinion provides any additional evidence supporting the ALJ's RFC assessment. While the parties

---

[16]     We are also troubled that, as between a family physician (Dr. Gerstman), a treating industrial orthopedic specialist (Dr. Goldberg), a treating orthopedic surgeon (Dr. Witkin), a consulting neurosurgeon (Dr. Yoon), a treating physiatrist (Dr. Theerasakdi), and an IME doctor retained in defense of Plaintiff's worker's compensation claim (Dr. Valentino), the ALJ would afford the greatest weight to Dr. Valentino. While the ALJ claimed to recognize the comparative weight ordinarily assigned among treating, consulting, and non-examining medical sources (Tr. at 20, citing SSR 96-2p), her choice here does not appear to us to be supported by substantial evidence. In addition, we note that Dr. Valentino's opinion pre-dated significant MRI studies and was over a year out of date at the time of the hearing.

in their respective briefs interpret Dr. Goldberg's statements regarding Dr. Valentino's conclusions in the light most favorable to them, we find his position far from clear.  In his own direct assessment of Plaintiff's work capacity in September and October 2002, Dr. Goldberg opined that Plaintiff was capable only of performing sedentary work for four hours per day and with a 10-lb. lifting restriction and a prohibition against any repetitive motion involving her upper extremities. (Tr. at 155-56.) He also saw Plaintiff on November 1, 2002, at which time he noted little improvement and ordered an MRI. (Tr. at 155.)  Dr. Goldberg was later presented with Dr. Valentino's IME report, which was presumably oriented towards the issue of whether Plaintiff continued to have any limitations due to the injury she claimed to have suffered at work in April 2002.  His comments on that report strike us as rather unclear.  He stated in a letter of February 11, 2003 that he "agreed with" Dr. Valentino's "recommendations." (Tr. at 152.)  However, he also recited that he had sent Plaintiff back to work on a four-hour per day basis and that Plaintiff was unable to sustain such work. (Tr. at 153.)  He noted that he could not explain Plaintiff's symptomatology but did not discredit Plaintiff's complaints; rather, he referred her to a neurosurgeon for an "unbiased opinion" that hopefully would assist in resolving the situation. (Tr. at 153.)  His report includes the following comment — which we have difficulty understanding in the context: "Please note again that on January 6, 2003, although I believe Dr. Valentino's opinion, this is solely based on my last examination of Donna on November 1, 2002." (Tr. at 153.)[17]  It is unclear to us whether, as Plaintiff argues, Dr. Goldberg's "agreement" referred only to Dr. Valentino's conclusion that Plaintiff suffered no residuals from her work injury

---

[17]     Again, Dr. Goldberg's office visit note of November 1, 2002 does not address the level of work of which he believed Plaintiff capable, nor does it purport to alter in any way his assessment from the previous two months that Plaintiff could work no more than four hours per day, even in a sedentary position with lifting and other restrictions. (Tr. at 155.)

19

as opposed, perhaps, to another cause[18] — which is a more narrow issue than whether Plaintiff suffers from severe impairments that limit her ability to perform substantial gainful activity — or whether, as Defendant asserts, Dr. Goldberg was assenting to Dr. Valentino's conclusion that Plaintiff could work even at her medium-exertional job, full time, with no restrictions.  We do not believe that Dr. Goldberg's cryptic comments bolster Dr. Valentino's conclusion or entitle it to any additional weight due to Dr. Goldberg's status as a treating physician.

Given the ALJ's inconsistent application of Dr. Valentino's opinion and her over-reliance on that opinion as "agreed" to by Dr. Goldberg, we cannot conclude that the ALJ's RFC assessment was based on substantial evidence.  This tainted the hypothetical presented to the VE and the ALJ's conclusion, based on the VE testimony, that a significant number of jobs existed in the national economy that Plaintiff could perform.  While we appreciate, as Plaintiff emphasizes in her brief, that it is the Commissioner's burden at Step 5 to demonstrate that there are other jobs that she can perform and that the ALJ failed to do so here, we believe that the matter should be remanded for the ALJ to make a more appropriate RFC assessment that incorporates the findings of the medical sources in a more consistent manner.

Accordingly, this Court's recommendation follows.

---

[18]     As Plaintiff notes in her brief, Dr. Goldberg speculated in July and August 2002 that Szczurek's complaints could be attributable to fibromyalgia.  (Tr. at 157.)

## <u>RECOMMENDATION</u>

**AND NOW**, this 13th day of December, 2005, it is respectfully **RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Doc. No. 5) be **GRANTED IN PART AND DENIED IN PART**, that Defendant's Motion for Summary Judgment (Doc. No. 8) be **DENIED**, and that the case be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation.


BY THE COURT:


/s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

21